# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

WILLIE C. WARRIOR, III,

    **Plaintiff,**

    v.                                        **Case No. 20-CV-1873-SCD**

KILOLO KIJAKAZI,[1]
**Acting Commissioner of Social Security,**

    **Defendant.**

## DECISION AND ORDER

    Somebody attacked Willie Warrior in 2016. They jumped him from behind and shot him in the face with a shotgun. Warrior survived. He applied for Social Security benefits in 2018, alleging disability based on a variety of physical and mental impairments resulting from the gunshot. Following a hearing in 2020, an administrative law judge denied benefits, finding that Warrior remained capable of working with moderate limitations. Warrior now seeks judicial review of that decision, arguing that the ALJ committed two reversible errors. First, Warrior argues that the ALJ failed to consider his migraine headaches under Listing 11.02. Second, Warrior argues that the ALJ's decision is not supported by substantial evidence because she ignored the consistent medical opinion evidence supporting greater limitations on Warrior's ability to interact with others. Because I agree that the ALJ's omission of Listing 11.02 is a reversible error, I will remand the case for further proceedings.

## BACKGROUND

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Accordingly, Kijakazi is substituted for Andrew M. Saul as the named defendant in this action pursuant to Fed. R. Civ. P. 25(d).

Warrior was born on April 23, 1996. R. 47.[2] He has never had a job but is eligible for benefits because his alleged disability onset date predated his 22nd birthday and his mother, Sharita Matthews, is an insured individual. R. 21, 101; *see* 42 U.S.C. § 402(d)(1)(G). On August 28, 2016, when Warrior was 20, he presented to Froedert Hospital with a close-range gunshot wound to his right face and neck area. R. 825. Warrior reported that he was walking from his house to a gas station when he passed by two people who "looked at him funny." R. 333. He passed them, turned over his right shoulder to look back, felt something hit his face, and only heard gunfire after he fell to the ground. R. 333, 825. Eventually, lab results would show multiple metallic densities in the soft tissue of his face and scalp that were consistent with bird shot from a shotgun. R. 828. The trauma doctor also discovered a foreign body lodged in Warrior's left eye. R. 826. Warrior immediately lost vision in his left eye and never regained it. R. 828, 105. While fortunate to escape with his life, the medical fallout from this violent attack has consumed Warrior's years since.

**A. Warrior's Documented Physical Impairments Following His Gunshot**

Between August and October 2016, Warrior had at least 3 optical surgeries and at least 11 post and pre-operative appointments. R. 293–360. Unsurprisingly, given the proximity to extended surgeries to remove shrapnel from the globe of his eye, Warrior consistently reported high levels of pain in his eye and head,[3] *e.g.*, R. 333, as well as medication-resistant headaches, R. 339, and difficulty sleeping, R. 333, 508, during his appointments.

---

[2] The transcript is filed on the docket at ECF No. 16-2 to ECF No. 16-21.
[3] Throughout the record, and throughout this Decision and Order, the terms "head pain," "headache," "migraine," and "tension-type headache" are used to describe Warrior's chronic symptoms. The Social Security Administration generally considers these monikers under the category "primary headache disorder." *See* Social Security Ruling 19-4p, 2019 SSR Lexis 6, 84 Fed. Reg. 44667-01 (Aug. 26, 2019). As explained below, *infra* pp. 16–19, the SSA may consider a primary headache disorder as a medically determinable impairment, and further as a listing, if certain conditions are met. *Id.* Accordingly, even though terms like "head pain," "headache,"

In October 2016, with his optical surgeries behind him, Warrior began pain management and rehabilitation. Warrior went to a pain management center for head pain that began the day he was shot and continued to interfere with his daily activities. R. 333. The consulting physician, Dr. Endrizzi, noted that "[t]he pain is in [Warrior's] right head (temporoparietal area) and it radiates over and across his forehead to just over his left eye, and is migratory." *Id.* In December 2016, Warrior returned to the pain management center and visited with Dr. Endrizzi again. R. 356. Warrior was seeking narcotic medication because of his head pain and headaches. *Id.*

On March 27, 2017, Warrior established care with Dr. John P. Wall, a family medicine physician, for persistent pain and anxiety. R. 373–74. Warrior visited Dr. Wall 5 times in 2017, and at each visit Warrior received care for either eye pain or headaches. R. 374 ("Left eye pain"), 379, 384 ("Chronic headaches"), 574–75 ("periodic headaches" and "Chronic headaches"), 576 ("tension headaches"). Dr. Wall continued to treat Warrior for headaches in 2018. Relevant to the gunshot wound, Dr. Wall saw Warrior for 4 appointments in 2018 and consistently noted Warrior's headaches. R. 578 ("Chronic headaches"), R. 579, ("headaches"), R. 776 (diagnosing Warrior with "Chronic tension-type headache, not intractable"). Dr. Wall continued to treat Warrior in 2019 for eye pain and headaches, *E.g.*, R. 987, and documented that Warrior had a medical history of migraines. R. 1025, 1022, 1014, 1010. In 2020, Warrior saw Dr. Wall three more times for his chronic headaches and migraines. R. 1004, 999–1002, 994.

Dr. Wall was not the only medical professional to note Warrior's severe headaches. On January 13, 2017, Dr. Muralidharan noted Warrior reported headaches "similar to a

---

"migraine," and "tension-type headache" are used interchangeably, as symptoms, they describe the same legal category—"primary headache disorder."

migraine." R. 613. On the same date, Dr. Nicole Martin noted that Warrior had "pain of the head that is present on the right side over the top of the head. The pain is 10/10 and can be better or worse with sound. Sometimes the head feels cold and is worse with cold outside. Pain is throbbing to achy and feels like someone is touching the inside of his head." R. 610. On January 23, 2019, Warrior saw Dr. Wilkes for eye pain. R. 960–965. Dr. Wilkes noted that Warrior had "[e]ye pain in the left eye. Characterized as aching, sharp pain, pressure, and throbbing. Pain was noted as 9/10. Occurring constantly. It is worse throughout the day. Duration of 2 years. Since onset it is gradual growth." R. 964. On April 24, 2019, Dr. Conto observed Warrior, noting that Warrior had throbbing, stabbing pain in his left eye, and assessed Warrior with a chronic, intractable headache. R. 961. On May 19, 2019, Dr. Mazzilli observed Warrior, noting that Warrior suffered from an intractable, chronic, post-traumatic headache. R. 738.

**B. Warrior's Mental Impairments and His Ability to Interact with Others**

In addition to severe and chronic headaches, Warrior struggled with mental impairments, including post-traumatic stress disorder, anxiety, and depression. While several doctors noted Warrior's mental impairments, three—Drs. Meyers, Barthell, and Cremerius—opined specifically about Warrior's ability to interact with others in a professional context. The parties disagree significantly about the opinions of these three doctors. *Compare* ECF Nos. 20, 27 *with* ECF No. 24. Warrior's specific challenge to the ALJ's RFC is that she failed to adequately account for Warrior's limitations on interacting with others because the opinions of these three doctors supported greater limitations. ECF No. 20 at 20–35. The Commissioner, in turn, contends that the ALJ thoroughly analyzed the opinions of each doctor, incorporated some of their findings, and explained why the overall record supported

limited deference to the opinions. ECF No. 25 at 8–13. Accordingly, what follows is a summary of each opinion with an emphasis on what each doctor said about Warrior's capacity to interact with others.

*Dr. Meyers.* Dr. Jeremy Meyers, Ed.D, is a Doctor of Education who completed a Psychological Disability Report for Warrior on May 30, 2019. R. 976–981. Dr. Meyers characterized Warrior's chief mental complaints as "difficulty with his memory, that he suffers from anxiety and that he experiences panic attacks." R. 976. Dr. Meyers' report was generated over the course of a 51-minute interview. *See id.* The report consists of Warrior's subjectively reported symptoms, Dr. Meyers' professional observations, certain objective performance tasks, a collateral interview with Warrior's mother, and ultimately, a professional conclusion about Warrior's capacity to work. R. 976–979.

According to Dr. Meyers' report, Warrior relayed that on the day of the examination "he felt okay, emotionally." R. 977. Warrior stated that he sleeps very little, has very little energy, and that his appetite is inconsistent. R. 977–78. Warrior spoke of excessive weight loss (he dropped from 280 pounds to 170), symptoms of worthlessness over his partial blindness, crying spells, suicidal thoughts, and his preference to withdraw from people out of distrust. R. 978. Despite this preference, Warrior also stated that he keeps in contact with members of his family and maintains other social friendships. R. 977. Warrior stated that he does not have a bad temper and denied a history of violence. *Id.*

As for professional observations, Dr. Meyers offered that Warrior's "behavior and affect were considered congruent with a generally positive emotional state," and that "[n]o evidence of excessive anxiety was observed." *Id*. He further opined that Warrior showed some signs of paranoid ideation because of his belief that people cannot be trusted. R. 978. Dr.

Meyers also noted that Warrior "related to the examiner and to the ongoing process of this examination quite well." R. 977. Dr. Meyers noted this observation several times, including an assessment that Warrior's "communication skills were good and he expressed himself adequately. No evidence of psychomotor agitation or retardation was observed and Mr. Warrior was cooperative and neither irritable nor belligerent." *Id.* Dr. Meyers also included that Warrior exhibited signs of "[p]oor social judgment," because of his lack of success in school and his criminal record. *Id.*

Warrior completed several performance tasks during his observation with Dr. Meyers. Warrior was able to recall three objects after five minutes, and he showed some mastery of digits and counting. R. 978. He showed no difficulty in following a three-step command, accurately identified apples and bananas as fruit, and accurately interpreted the proverb "don't count your chickens until they hatch." *Id.* In her collateral interview, Warrior's mother explained that her son has a history of being bullied and picked on at school because of his tall, skinny frame. *Id.* She said that he cries a lot, that he is afraid to venture out of the house, that he has difficulty controlling his anger, and that he gets shaky and nervous when he is put in uncomfortable situations. *Id.*

Based on his visit with Warrior, in the section of his report entitled "Statement of Work Capacity," Dr. Meyers concluded that:

> Mr. Warrior should be able to understand, remember, and apply information subject to limitations imposed by his physical condition. He may have difficulty interacting with others because of paranoid ideation and a desire to isolate. Maintaining concentration and attention should be manageable and he should be able to meet work pace demands, subject to limitations imposed by his physical condition. He is not considered to be an individual with the ability to independently manage his behavior and emotions, when faced with a requirement for significant life changes.

R. 979. Beyond this, Dr. Meyers did not declare whether Warrior was disabled, or not, nor did he opine whether Warrior was precluded from work, or not. *See id.*

*Dr. Barthell.* Dr. Robert Barthell is a psychologist who completed a disability determination for Warrior on June 10, 2019, as part of Warrior's application for social security benefits. *See* R. 86–99. Dr. Barthell noted that Warrior had five medically determinable impairments (MDIs): loss of central visual acuity, migraine, anxiety and obsessive-compulsive disorders, trauma- and stressor-related disorders, and neurocognitive disorders. R. 90. None, in the opinion of Dr. Barthell, precisely satisfied the diagnostic criteria to be presumptively disabling. *See* R. 91. Dr. Barthell considered four areas of Warrior's mental competency—known as the "Paragraph B" criteria, they are (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself—and opined that Warrior had a "moderate" limitation in each. *Id.* Dr. Barthell's assessment tracks the language of the social security regulations. *See* 20 C.F.R. pt. 4, Subpt. P, App. 1 § 12.00. Dr. Barthell's fidelity to the Paragraph B criteria is rational because for an ALJ to determine that Warrior's mental impairments were presumptively disabling, the ALJ would need to recognize that Warrior had an "extreme" limitation of one, or a "marked" limitation of two of the four Paragraph B criteria. *See id.*

Next, Dr. Barthell summarized his psychiatric review of Warrior, a process that consisted of evaluating Warrior's subjective claims, reviewing his performance on some objective tasks with Dr. Meyers, and reviewing Warrior's other medical records. *See* R. 91. Dr. Barthell noted that Warrior reported memory issues and panic. R. 91. Warrior reported that he has an anxiety diagnosis, but neither takes medication nor sees a mental health professional. *Id.* Warrior reported that he does not cook and does not like to clean because it

takes him a long time. *Id.* Warrior also reported that he spends most of his time watching TV or playing video games. *Id.* Warrior stated he had poor appetite and sleep patterns, while endorsing feelings of worthlessness, crying spells, passive suicidal ideations, and social withdrawal. *Id.* Warrior also stated that he feels very depressed, is fearful of going outside, has difficulty controlling behavior, and gets very anxious. *Id.* On the performance tasks, Dr. Barthell noted that Warrior was able to recall digits forward and backward, count by threes, spell W-O-R-L-D backwards, and perform a three-step command. *Id.*

Dr. Barthell explained in detail how he arrived at "moderate" limitations across all four Paragraph B criteria in his RFC assessment. R. 93–99. For Warrior's social interaction limitations, Dr. Barthell noted that Warrior has moderate limitations on interacting with the public and with responding to criticism from supervisors. R. 97. Dr. Barthell noted that Warrior had no limitations on asking questions, requesting assistance, getting along with coworkers or peers, the ability to be socially appropriate, or the ability to adhere to basic standards or neatness and cleanliness. *Id.* By way of narrative explanation, Dr. Barthell wrote that Warrior "is able to respond to supervisors and interact with the public on a minimal basis. He is noted to be isolative and have issues with temper, but he is consistently seen as pleasant and cooperative at exams." *Id.* Based on this psychiatric review, Dr. Barthell concluded that Warrior had "moderate" limitations across the four Paragraph B criteria and was not disabled. R. 91, 99. Finally, Dr. Barthell identified the report from Dr. Meyers as a medical opinion that was more restrictive than his own findings. R. 98.

*Dr. Cremerius.* Dr. Michael E. Cremerius, Ph.D is a clinical psychologist who completed a disability determination on October 31, 2019, as part of Warrior's application for social security benefits. R. 116–135. Dr. Cremerius noted that Warrior had eight MDIs:

visual disturbances, migraine, asthma, anxiety and obsessive-compulsive disorders, trauma- and stressor-related disorders, neurocognitive disorders, depressive, bipolar and related disorders, and substance addiction disorders (drugs). R. 109. Dr. Cremerius opined that none of the eight MDIs equaled a listing, reasoning that each of the mental impairments did not precisely satisfy the diagnostic criteria from Paragraph B. R. 124. Further, Dr. Cremerius rendered the same conclusion as Dr. Barthell, that Warrior had "moderate" limitations across all four of the Paragraph B criteria, including the ability to interact with others. R. 124–125. Dr. Cremerius, like Dr. Barthell, identified the report from Dr. Meyers as more restrictive than his own findings, writing that Dr. Meyers' "[o]pinions are not fully supported by the objective evidence in file," and that "[t]he medical opinion is without substantial support from the medical source who made it, which renders it less persuasive." R. 127; 134.

Dr. Cremerius explained how he arrived at "moderate" limitations across all four Paragraph B criteria by completing a functional capacity assessment for Warrior. R. 127–135. Of Warrior's social interactions limitations, Dr. Cremerius wrote that Warrior has "moderate" limitations in interacting with the general public, accepting instructions and criticism from supervisors, and getting along with coworkers or peers. R. 133. Dr. Cremerius also wrote that Warrior has no limitations regarding his ability to ask questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. *Id.* To explain these conclusions, Dr. Cremerius wrote, "[t]he claimant would be limited to brief and superficial contact with co-workers and supervisors, no contact with the public." *Id.* In conclusion, Dr. Cremerius determined that Warrior was not disabled, saying Warrior's "condition results in some working limitations in [his] ability to perform

work related activities, but does not prevent [him] from working. Therefore, a period of disability cannot be established." R. 134–35.

## C. Hearing Testimony

On June 17, 2020, the ALJ held an administrative hearing. Warrior testified that his typical day consists of "trying to not be in my pain." R. 49. He explained that since being shot, he is not able to sustain any activity for very long. *See id.* Warrior testified that he travels to medical appointments with his mother, but that if he tries to undertake even a mundane activity, such as playing cards, he gets dizzy spells, hot and cold sensations throughout his head, and suffers extreme head pain he cannot ignore. R. 49–50. When asked about his participation in household tasks, Warrior indicated "I don't really do anything. . . . I'll be like stuck in the house. I have very bad migraines and stuff." R. 51–52. Warrior further testified, in response to a question about the frequency of his headaches, that he constantly has a headache. R. 55. He explained that his headaches "do not stop," with intense bouts of pain lasting "hours, days at a time" that can only be calmed down with pain medication or lying down in a dark room. *See* R. 56. In explaining how he deals with the pain from his migraine headaches, Warrior stated, "[o]ne minute I'm—like with the migraine-wise, sometimes I try to—because I'm not allowed to overdo my medication, and I don't want to overdo my medication so I try to lay down." *Id.* Warrior also testified that his headaches are exacerbated by light, heat, and sound. R. 56–57.

Other than pain management, Warrior also testified about his daily activities. Warrior has children, but he struggles to provide much childcare. R. 50. In his words, "I have kids, they show up but I can't play with them too much. So the most that I do is watch TV. I might play the game, I can't play it too long . . . because my vision blurs up or it'll start hurting." *Id.*

Warrior also explained that he sometimes goes to the grocery store, but leaving the house is both a physical and mental challenge. R. 51. He stated that "since my incident . . . I'm paranoid. I can't help it." *Id.* And inside the house, Warrior testified that his migraines prevent him from assisting with cooking or cleaning. R. 51–52. Warrior summarized his testimony by explaining "I feel like personally I can't work because I can't stand up too long. I'm paranoid around others. I'm already kind of scared being around my own friends. Like I don't know who's done what to me. And my pain meds sometimes don't allow me to do a lot of moving." R. 59.

Darren Wright testified as the impartial vocational expert. R. 63–67. Acknowledging that Warrior had no previous work experience, the ALJ asked Wright to consider career possibilities for a hypothetical worker capable of medium work as defined in the regulations, but with the following additional limitations: (1) preclusion from climbing ladders, ropes or scaffolds; (2) no work at unprotected heights or around heavy machinery; (3) no requirement for left peripheral vision, depth perception, or the ability to distinguish colors; (4) no more than moderate exposure to noise or light; (5) no concentrated exposure to extreme heat, cold, humidity, and to fumes, dusts, odors, gases, and other irritants; (6) only occasional work-related decisions and interactions with supervisors, coworkers and the public. R. 64. The ALJ also included that this potential worker can understand, remember, and carry out simple instructions, as well as maintain concentration, persistence, and pace for two-hour intervals over an eight-hour day with routine breaks. *Id.* Under these conditions, Wright testified that the hypothetical worker could perform several jobs, including checker I, box bender, and linen room attendant. R. 65.

Next, the ALJ further limited the hypothetical worker by asking about migraine headaches. "Okay. So if my hypothetical individual, due to persistent migraine headaches is likely to be absent from work two or more days per month on an ongoing and unpredictable basis, would there be any jobs available?" R. 66. Wright testified that this migraine headache limitation would preclude all work. *Id.*

**D. The ALJ's Unfavorable Decision**

Applying the standard five-step process, *see* 20 C.F.R. § 404.1520(a)(4), on June 20, 2020, the ALJ issued a written decision concluding that Warrior was not disabled. *See* R. 21–36. At step one, the ALJ determined that Warrior had not engaged in substantial gainful activity since his gunshot wound. R. 24. At step two, the ALJ determined that Warrior had "the following severe impairments: status post gunshot wound with residual chronic pain, left eye blindness, and headaches; asthma; depression; anxiety; and post-traumatic stress disorder." *Id.*

At step three, the ALJ found that Warrior did not have an impairment or combination of impairments that equaled the severity of a presumptively disabling impairment. R. 24–26. The ALJ considered Listing 2.02 (loss of visual acuity), 2.03 (contraction of the visual fields in the better eye), 2.04 (loss of visual efficiency), 3.03 (asthma), as well as mental disorders Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders).[4] R. 24–25. Despite the overwhelming medical evidence of chronic migraine headaches, the ALJ did not consider Warrior's headaches under the relevant Listing, 11.02 (epilepsy). *See id.*

---

[4] The ALJ provided only the numbers of the listings. The parenthetical categories come from the SSA regulations, available at https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm.

At step three, the ALJ considered Warrior's "head pain" for its impact on whether Warrior's mental impairments—depression, anxiety, and PTSD—equaled a listing, but not as a standalone listing. R. 25. In general, to qualify as a listing at step three, a mental disorder must satisfy the requirements set forth in Paragraphs A and B or A and C of the regulations. Noting this requirement, the ALJ analyzed Warrior's mental impairments for each of the Paragraph B requirements, looking for an "extreme" limitation in one, or "marked" limitation of two of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt and manage oneself. R. 25–26. The ALJ reasoned that Warrior's head pain factored into a "moderate" limitation for just one of the Paragraph B criteria: concentrating, persisting, or maintaining pace. *Id.* But it did not impact any of the other three. *See id.* Because Warrior had only moderate limitations on each of the four areas of mental functioning, the ALJ concluded that the Paragraph B criteria were not satisfied, and Warrior's mental impairments, therefore, did not equal any listing. R. 26. To reiterate, the ALJ did not consider Warrior's headaches at step three, despite listing them as a severe impairment at step two.

At step four, the ALJ determined that Warrior had an identical residual functional capacity to the hypothetical worker she theorized during the hearing, excepting the work-preclusive migraine limitation. *See* R. 26–27; 63–67. Accordingly, the ALJ found that Warrior could perform a range of work at the medium exertional level with additional restrictions, in line with the testimony from the neutral vocational expert. R.34. Warrior's asthma and headaches reduced his RFC from unrestricted to medium. *Id.* Warrior's vision impairment, headaches, chronic eye pain, and mental impairments accounted for his additional restrictions. *Id.*

At step five, the ALJ determined there were a significant number of jobs in the national economy that Warrior could perform, including, for example, a box bender, a linen room attendant, a stuffer, a checker I, a marker, and an ironer. R. 34–36. Based on those findings, the ALJ determined that Warrior was not disabled from August 28, 2016, through the date of the decision. R. 36.

Thereafter, the SSA's Appeals Council denied Warrior's request for review. R. 6–8. The ALJ's decision therefore became the final decision of the Commissioner of Social Security. *See Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). Warrior filed this action seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). ECF No. 1. The matter was reassigned to me in January 2021 after all parties consented to magistrate-judge jurisdiction under 28 US.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6, 7. Now, the matter is fully briefed and ready for disposition. *See* ECF Nos. 20, 24, 27.

## LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S.

389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). When building an accurate and logical bridge between evidence and

conclusion, the ALJ is not "required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence." *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Warrior contends that the ALJ committed two errors in her decision: (1) failing to assess his migraine headaches under Listing 11.02 as dictated by SSA policy, and (2) assessing an RFC contrary to consistent medical evidence that supported greater limitations on social and professional interactions in the workplace.

### I. The ALJ's Failure to Evaluate Migraines at Step Three

Warrior argues that the ALJ failed at step three to assess whether his migraine headaches met Listing 11.02. At step two, the ALJ determined that Warrior has several severe impairments, including headaches. R. 24. At step three, the ALJ discussed whether Warrior's loss of vision, asthma, depression, anxiety, and PTSD met or medically equaled one of the listed impairments in the federal regulations. R. 24–26. The ALJ did not evaluate Warrior's headaches to determine if they medically equaled a listing.

"At step three, the ALJ must determine whether the claimant's impairments are 'severe enough' to be presumptively disabling—that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary." *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020) (citing 20 C.F.R. § 404.1525(a)). "An impairment is presumptively disabling if it is listed in the relevant regulations' appendix,

*see* 20 C.F.R. § 404.1525(a), or if it is 'medically equivalent' to a listing, *id.* § 404.1526(a)." *Id.* "When evaluating whether an impairment is presumptively disabling under a listing, the ALJ 'must discuss the listing by name and offer more than a perfunctory analysis of the listing.'" *Id.* (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

There is no specific listing for migraines. According to SSA guidance, the most analogous listing for evaluating migraines is 11.02 (epilepsy). *See Snow v. Berryhill*, No. 3:18-CV-434-JD, 2019 U.S. Dist. LEXIS 71368, at *9 (N.D. Ind. Apr. 16, 2019) ("While no specific Listing for Migraines exists, the Commissioner 'routinely considers [this] impairment[ ] under the criteria for the Listing [for epilepsy,' which is now 11.02.") (quoting *Horner v. Berryhill*, No. 17 C 7586, 2018 U.S. Dist. LEXIS 138660, at *4 n.1 (N.D. Ill. Aug. 16, 2018)).

Warrior has the burden of showing that his migraines meet Listing 11.02, and he must show that migraines satisfy all the various criteria specified in the listing. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). When the record supports it, the ALJ "should mention the specific listings [she] is considering and [her] failure to do so, if combined with a perfunctory analysis, may require a remand." *Id.* (remanding because the ALJ neither mentioned the applicable listing nor evaluated whether claimant met that listing based on record evidence) (internal quotation marks and citations omitted).

In this case, Warrior met his burden. The Commissioner argues that Warrior has not shown how he could satisfy a listed impairment for migraines. ECF No. 24 at 13–15. But even a cursory review of the record reveals a plethora of evidence showing that Warrior suffers from chronic, severe, and frequent migraine headaches. Listing 11.02 has two relevant provisions implicated by the record, 11.02B and 11.02D. *See* 20 C.F.R. pt. 4, Subpt. P, App. 1 § 11.02. Under both provisions, a claimant must have documented migraine headaches from

an acceptable medical source with the same frequency that a person with epilepsy has seizures. *Id.* According to SSR 19-4, "a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in Listing 11.02 (paragraph B or D for dyscognitive seizures)." For 11.02B, the claimant must have dyscognitive seizures (or in this case, migraines) at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. *Id.* For 11.02D, the claimant must have dyscognitive seizures (or in this case, migraines) at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, as well as a "marked" limitation in physical functioning, understanding, remembering, or applying, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing oneself. *Id.*

As detailed above, the record unequivocally shows that Warrior had migraine headaches—as documented from a variety of medically acceptable sources—with the frequency required by the regulations. The record also supports that Warrior followed a treatment plan for several years with Dr. Wall. Warrior suffered from chronic and severe headaches for years, and he has maintained treatment with doctors specifically to address his headaches. The record is extensive, and from it Warrior has met his burden to show that his migraines satisfy all the frequency and treatment criteria in Listing 11.02B. As for 11.02D, even though the ALJ determined that Warrior's limitations were "moderate" as opposed to "marked" for the mental impairment Paragraph B criteria for the listings in section 12.00, the record merits, at minimum, a discussion of how Warrior's headaches impact those criteria in section 11.00. For a variety of reasons, the ALJ might have decided that Listing 11.02 did not apply, but *Jeske* requires that, at minimum, the ALJ identify the listing by name and explain why it does not. 955 F.3d at 588. At step two, the ALJ identified headaches as a severe

impairment to Warrior's ability to work. After that, per SSA guidance, she should have explained why that impairment did not equal the relevant listing. Because Warrior carried his burden, the ALJ must do what *Jeske* requires: at minimum, identify the listing by name and explain why it does not apply. Without this minimum articulation, I cannot say that substantial evidence supports the ALJs conclusion that Listing 11.02 does not apply. Accordingly, I will remand this case for further proceedings and a new determination as to whether Listing 11.02 applies.

## II. Substantial Evidence Supports the ALJ's Assessment of Warrior's Symptoms and Weighing of the Medical Opinion Evidence

Next, Warrior argues that the ALJ's findings in the RFC—specifically as to Warrior's ability to interact with others—are not based in evidence because the medical opinions consistently supported more substantial limitations. Along the way, Warrior accuses the ALJ of failing to construct a logical bridge between the evidence and her conclusion by playing doctor, improperly deviating from the medical opinion evidence, and cherry-picking the record for evidence that emphasized Warrior's ability to work while downplaying the evidence that supported disability. I disagree with each of Warrior's arguments and conclude that substantial evidence supports the ALJ's RFC assessment, including her assessment of Warrior's ability to interact with others.

In assessing a claimant's RFC, the ALJ must evaluate the claimant's symptoms and assess how those symptoms impact what a claimant can do in the workplace. The process for evaluating Warrior's symptoms has two major steps. First, the record must show "objective medical evidence from an acceptable medical source that shows [Warrior has] a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged." *See* 20 C.F.R. § 404.1529(a). Second, the ALJ must evaluate the intensity and

persistence of Warrior's symptoms, determine how they limit his capacity for work, and ultimately assess Warrior's RFC. *See* 20 C.F.R § 416.929(c). It is common for social security cases to contain conflicting medical evidence. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). As the "trier of fact," the ALJ has the "duty to resolve that conflict." *Id.*; *see also* 20 C.F.R §§ 416.927(c), 416.929 (directing that ALJs weigh conflicting medical evidence). As for how to evaluate medical opinion evidence, the social security regulations require that the ALJ consider the medical professional's explanation *and* the objective medical evidence presented by the medical source. *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The most important factors in weighing medical opinions are supportability and consistency with the evidence. *See* 20 C.F.R. § 416.927.

My role is limited; I must evaluate whether substantial evidence supports the ALJ's assessment and affirm if it does, even if some of the ALJ's findings are "a bit harsh." *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). "An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Kasberger v. Astrue*, No. 06-3868, 2007 WL 1849450, at *4 (7th Cir. June 27, 2007) (internal quotations and citations omitted). Rather, I must evaluate whether the ALJ's RFC falls safely within "a zone of choice within which the decisionmakers can go either way, without interference from the courts." *Id.* (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc)). To evaluate a claimant's symptoms, an ALJ may consider the claimant's credibility, and, to that end, may consider how a claimant's self-reported daily activities comport with his alleged limitations. *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). I will not upset an ALJ's credibility determination so long as it finds some support in the record and is not patently wrong. *See Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *see also Prochaska*

*v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Considering all of this—Warrior's symptoms, the doctors' opinions, and the ALJ's credibility determinations—I conclude that substantial evidence supports the ALJ's assessment of Warrior's ability to interact with others.

In this case, the record is mixed. It contains several ambiguous medical opinions—opinions from which reasonable minds could draw opposing conclusions. Emblematic of this is an opinion from Dr. Barthell from his RFC assessment of Warrior on June 10, 2019. R. 97. In response to the prompt "[e]xplain in narrative form the social interaction and/or limitations:" Dr. Barthell wrote "[t]he claimant is able to respond appropriately to supervisors and interact with the public on a minimal basis. He is noted to be isolative and have issues with temper, but he is consistently seen as pleasant and cooperative at exams." *Id.* Made up of four clauses—two supporting some ability to work and two supporting disability—Barthell's opinion can clearly lead to opposing conclusions. The evidence of both possible conclusions sits right next to other. In fact, though Warrior insists that Dr. Barthell's opinion requires greater restrictions than the ALJ's RFC, his opinion is the same as the ALJ's: he found that Warrior had a "moderate" limitation on the ability to interact with others, and so did the ALJ.

In a case like this, the aggrieved party is likely to feel that the ALJ minimized their favorable evidence while overvaluing (or cherry-picking) the other side's. But an ALJ must make a binary determination, disabled or not, and must only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *see also Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally

inconsistent, as long as he minimally articulate[s] his reasons for crediting or rejecting evidence of disability.") (internal quotation marks and citations omitted).

The ALJ has met this standard. To begin, she sufficiently summarized her assessments of Warrior's mental impairments, including his ability to interact with others, as follows:

> His moderate difficulties in the ability to understand, remember, and apply information and moderate difficulties in concentration, persistence, or pace are addressed by limiting him to simple tasks while maintaining concentration for up to two hour intervals with routine breaks. The claimant's moderate difficulty with social interaction is addressed by a limitation to occasional interaction with supervisors, coworkers, and the public. The claimant's moderate difficulty with adaptation or self management is addressed with limitations on exposure to stress, decision-making responsibilities, and the degree of change in the work place.

R. 34. This assessment must stand if it is supported by substantial evidence and explanation.

Again, the record is mixed, but it does contain substantial evidence to support the ALJ's moderate limitations on Warrior's interactions with others. The ALJ explained the evidence upon which she relied while also explaining the evidence she chose not to credit. For example, supporting Warrior's "moderate," as opposed to "extreme" or "marked" limitations on interacting with others, the ALJ relied on medical evidence from a psychological consult. At Warrior's psychological consult with Dr. Meyers, Warrior was cooperative, exhibited normal mood and affect, was not irritable, belligerent, or excessively anxious. R. 29, 31, 977. Dr. Meyers also noted that Warrior interacts with his family and friends, that he does not spend very much time alone, that he does not have a bad temper, and that Warrior denies any history of violent behavior. R. 977. Warrior's visit with Dr. Meyers was necessary because Warrior had not participated in consistent mental health treatment, another factor counseling moderate as opposed to extreme limits. R. 29. Furthermore, the ALJ rendered a credibility determination—which is squarely in her purview to do—against

Warrior, finding (in the familiar boilerplate) two specific examples illustrating that Warrior's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* First, the ALJ noted an example of Warrior making apparently false statements to medical providers. R. 31. Second, despite testifying that he essentially never leaves the house, Warrior reported to Dr. Wall that he played basketball three times per week and to Dr. Meyers that he maintained several friendships and performed acts of daily living such as readying his children for school, cooking, cleaning, and shopping. *Id.* From these inconsistent reports, the ALJ concluded that, "when considered with the overall record, they suggest that [Warrior] retains greater mental functioning than alleged." *Id.* The ALJ's conclusion was reasonable; she didn't stretch the record to a conclusion that Warrior is entirely uninhibited by his mental impairments. Rather, in light of the mixed record, the ALJ concluded that Warrior remains capable of work with moderate limitations.

To be sure, the record also has substantial evidence for limiting Warrior's interactions with others beyond what the ALJ decided. But that is not the legal standard for remand. For example, two state agency doctors opined that Warrior should only interact with supervisors and the public on a *minimal* basis, as opposed to the *occasional* basis allowed for in the ALJ's RFC. Quoting SSR 96-8p, Warrior argues that the ALJ failed to even mention, let alone explain why she deviated from these medical opinions. ECF No. 20 at 21, 23 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). But the ALJ both mentioned the opinions and explained how and why she credited them:

First, she summarized the state doctors' opinions:

> State agency psychological consultants Robert Barthell, Psy.D. and Michael Cremerius, Ph.D. collectively determined the claimant had moderate limitations across all of the "paragraph B" criteria of mental functioning (Ex. 4A). The psychologists agreed the claimant could understand, remember, and carry out short and simple instructions and performance of simple, routine tasks, and respond to routine changes in the work setting (Exs. 4A, 6A). Dr. Cremerius further limited the claimant to no public contact and brief, superficial interaction with co-workers and supervisors and precluded performance of fast-paced tasks with strict production quotas (Ex. 6A).

Then, she explained why she found them partially persuasive:

> The undersigned finds these opinions partially persuasive. Moderate limitations in the "paragraph B" criteria and limitations for unskilled work with limited changes and some degree of limitation for social interaction are largely persuasive with the longitudinal evidence. However, the claimant demonstrated intact memory, attention, concentration, and cognition on a complete mental status evaluation, and evidenced no significant mood or behavioral irregularities (Ex. 13F). Although some distrust and paranoia are understandable given the claimant's history, he denies significant problems with regulating his moods and his mother does not report significant friction in their household (Ex. 13F). Thus, the degree of social difficulty identified by Dr. Cremerius appears to be somewhat overstated.

Finally, she both incorporated some of their limitations, while synthesizing the other record

evidence to account for her lessened restrictions:

> Limiting the claimant to performance routine tasks for two-hour intervals is sufficient given the lack of deficits in attention and concentration with mental status testing, the lack of need for mental health treatment, and performance of daily activities (e.g., playing video games, watching television, getting his three kids up and ready for school, playing basketball). A limitation to occasional interaction is also sufficient given evidence that the claimant is described as pleasant and cooperative by treatment providers (e.g. 11F/33, 130; 18F/13-14, 83-85). He was cooperative and not irritable on consultative examination, and he demonstrated good communication skills (13F).

R. 33. This is a legally sufficient RFC assessment. Citing the Fourth Circuit case of *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), Warrior asserts that the ALJ's RFC is deficient because "a proper RFC analysis has three components: (1) evidence, (2) logical explanation,

and (3) conclusion." ECF No. 20 at 23. Despite Warrior's insistence to the contrary, as shown above, the ALJ's assessment contained all three.

Finally, in addition to Drs. Barthell and Cremerius, Warrior takes exception to the way the ALJ considered Dr. Meyers' opinion. ECF No. 20 at 22–23. The gist of Warrior's contention is that the ALJ credited certain parts of Dr. Meyers' opinion, namely some treatment notes that suggested an ability to interact with others, while rejecting his conclusion that Warrior may have difficulty interacting with others. *Id.* Because of this, Warrior accuses the ALJ of playing doctor and cherry-picking portions of Dr. Meyers' opinion. But these allegations are conclusory and fail for the same reasons as they did against the ALJ's weighing of the opinions from Drs. Barthell and Cremerius.

Before unpacking the ALJ's treatment of Dr. Meyers' opinion, it is important to consider the limited extent to which the opinion supports Warrior's desired conclusion: that Warrior cannot work in a place where he needs to have occasional interactions with supervisors, coworkers, and the general public. Warrior met with Dr. Meyers one time, for a total of 51 minutes. *See* R. 976. Of Warrior's ability to interact with others, Dr. Meyers' opined that Warrior, "may have difficulty interacting with others because of paranoid ideation and desire to isolate." R. 979. This single sentence is the totality of Dr. Meyers' opinion on Warrior's ability to interact with others. As discussed above, it is the ALJ's role to weigh the medical opinions. *See* 20 C.F.R. § 416.927. The most important factors in weighing the medical opinions are supportability and consistency with the other evidence in the record. *See* 20 C.F.R. § 416.920c. "[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Rather, "the determination of a claimant's RFC is a matter

for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014).

The ALJ articulated her reasons for discrediting this portion of Dr. Meyers' opinion, saying "[i]n light of the claimant's reasonably good performance during examination, the absence of the need for mental health treatment, and generally unremarkable presentation on mental status exam with other providers," and she chose to credit Dr. Meyers' limitations on the complexity of work, but not the limitations for interacting with others. R. 33. Furthermore, the ALJ noted that much of Dr. Meyers' opinion was based on the subjective reports from Warrior, and the ALJ had already rendered a credibility determination against Warrior because of evidence that he made untrue statements to his doctors in the past. *See* R. 33. And both Drs. Cremerius and Barthell noted that Dr. Meyers' restrictions were out of proportion with the totality of the medical evidence. R. 97, 128, 134. Additionally, the ALJ determined that some of Dr. Meyers' opinion was based on Warrior's physical impairments, an area beyond his expertise. R. 33. And in any event, Dr. Meyers' single-sentence opinion is a far cry from conclusive that occasional interaction is beyond Warrior's capacity. Thus, the ALJ did what the regulations required her to do. She evaluated Dr. Meyers' opinion for its supportability, finding the opinion unsupported by his own notes, by its reliance on Warrior's subjective reports, and because it strayed beyond Dr. Meyers' area of expertise. She also evaluated Dr. Meyers' opinion for its consistency, finding the opinion inconsistent with Warrior's other mental status exams.

In sum, the ALJ appropriately weighed the medical opinion evidence from Drs. Barthell, Cremerius, and Meyers and her RFC assessment is supported by substantial evidence. Despite being nearly 1,500 pages, the administrative record is not awash with

evidence of Warrior's inability to interact with others, like it is with evidence of his chronic and severe headaches. None of the medical opinions concludes that Warrior is disabled or that he should be precluded from work because he cannot occasionally interact with others. For her part, the ALJ summarized and analyzed each opinion that Warrior now challenges, and she evaluated each opinion for its supportability and consistency with the other evidence of record. Because of this, I conclude that the ALJ's determination that Warrior can work with moderate restrictions is supported by substantial evidence and appropriately accounts for the medical opinion evidence.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ's decision is not supported by substantial evidence. The Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.


**SO ORDERED** this 4th of February, 2022.




STEPHEN C. DRIES
United States Magistrate Judge